IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT J. SULLIVAN, | ) | CASE NO. 1:14-cv-00344 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Robert J. Sullivan ("Plaintiff" or "Sullivan") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his applications for social security benefits. Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 15. As discussed below, the ALJ erred because, while she stated that she gave "significant weight" to the consultative examining psychologist's opinion and "some weight" to the state agency reviewing psychologist's opinion, her residual functional capacity ("RFC") assessment was inconsistent with those opinions in part and she failed to explain why she did not adopt certain limitations in those opinions. Accordingly, the Court **REVERSES and REMANDS** the Commissioner's decision.

## I. Procedural History

Sullivan protectively filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on May 26, 2011.[1] Tr. 239, 455-470, 484. He alleged a

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application." http://www.socialsecurity.gov/agency/glossary/ (last visited 2/10/2015).

1

disability onset date of September 30, 2007. Tr. 239, 457, 464, 484. Sullivan alleged disability due to back pain and arthritis.[2] Tr. 323, 337, 353, 368, 387, 391, 402, 406, 487. After initial denial by the state agency (Tr. 387-400), and denial upon reconsideration (Tr. 402-414), Sullivan requested a hearing (Tr. 415-416). On July 19, 2012, Administrative Law Judge Sara Alston ("ALJ") conducted an administrative hearing. Tr. 255-322.

In her August 22, 2012, decision, the ALJ determined that Sullivan had not been under a disability from September 30, 2007, through the date of the decision. Tr. 236-254. Sullivan requested review of the ALJ's decision by the Appeals Council. Tr. 234-235. On January 16, 2014, the Appeals Council denied Sullivan's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-7.

## II. Evidence[3]

### A. Personal, educational and vocational evidence

Sullivan was born in 1967. Tr. 261, 457, 464. He is married and has three adult children. Tr. 261. Since January 2008, Sullivan and his wife have lived with his mother in a garage apartment. Tr. 262, 266. He completed school through the 11th grade. Tr. 273. Sullivan last worked installing satellite dishes for Digital Dish. Tr. 267. He worked for Digital Dish from 2003 to 2007. Tr. 311, 514. Sullivan stopped working in 2007 because of lower back and neck pain. Tr. 308. Prior to working for Digital Dish, Sullivan installed alarm systems. Tr. 290, 514. Sullivan also served as a volunteer firefighter from 1995-2000. Tr. 291, 292, 514.

### B. Medical evidence

#### 1. Treatment history

---

[2] Sullivan did not initially allege disability based on a mental impairment. During his request for reconsideration, he alleged anxiety, OCD and mood problems. Tr. 354, 408.

[3] Sullivan's sole challenge is related to the ALJ's mental RFC finding. Thus, evidence summarized herein generally pertains to Sullivan's mental impairment claim.

Sullivan first sought mental health treatment in June 2012. Tr. 297-298, 644-648. On June 19, 2012, a nurse practitioner, Kathleen A. Christy, APN, ("Nurse Christy"), with Pathways, Inc. ("Pathways"), saw Sullivan and conducted an initial psychiatric evaluation. Tr. 297-298, 644-648. At the July 19, 2012, hearing, Sullivan indicated that he was scheduled to see a therapist at Pathways the following day and a physician at Pathways the following Monday. Tr. 297-298. As part of her initial evaluation, Nurse Christy diagnosed Sullivan with psychosis, NOS, mood disorder, depression, and PTSD. Tr. 646. She assessed a GAF score of 40.[4] Tr. 646. Nurse Christy prescribed Celebrex and Abilify. Tr. 646. Some of Nurse Christy's mental status examination findings included obsessional and paranoid thought content; auditory and visual hallucinations; depersonalization; derealization; logical but racing thought process; depressed, angry and irritable mood; constricted affect; cooperative behavior but impulsive and withdrawn with a loss of interest; average intelligence with no reported cognitive impairment, including no impairment in orientation, memory, attention/concentration, judgment, or insight. Tr. 648.

**2. Opinion evidence**

*Treating source*

On the same day that she initially evaluated Sullivan, Nurse Christy completed a Mental Capacity Assessment wherein she rated Sullivan's mental functional abilities in 20 areas within the four main categories of: understanding and memory; sustained concentration and persistence;

---

[4] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Id.*

3

social interaction; and adaption. Tr. 650-652. She rated Sullivan as having marked limitations in 3 of the 20 areas. Tr. 650-652. In the remaining 17 areas, she rated Sullivan as having extreme limitations. Tr. 650-652.

*Consultative examining psychologist*

On September 1, 2011, consultative examining clinical psychologist Richard C. Halas, M.A., ("Halas"), conducted a psychological evaluation. Tr. 638-643. Halas noted that Sullivan appeared cooperative, hesitant and anxious. Tr. 639. Halas also noted that Sullivan's behavior was flat, hesitant and compulsive. Tr. 640. Halas did not think Sullivan was impulsive but indicated that Halas had significant levels of Obsessive Compulsive Disorder noting that Sullivan reported that "things have to be in three's. My coffee can only be put together in order like putting the cream in first, then the coffee and then sugar" and he cannot drink it if it is not done in that order. Tr. 640, 642. Sullivan requested three HIPAA forms at his evaluation. Tr. 642. Sullivan also reported taking showers at 7:00 p.m. stating that he will skip family events because it might interfere with his shower time. Tr. 640. However, he denied it was a compulsion and referred to it as a routine. Tr. 640. Halas indicated that Sullivan showed extremely high levels of anxiety. Tr. 640. His hands trembled and he was prone to fidgeting. Tr. 640. Halas noted that Sullivan was guarded and suspicious. Tr. 641. Sullivan reported feeling as if people were always looking at him, including the people in the waiting area at his evaluation. Tr. 640, 641. Halas indicated that Sullivan was neither hallucinatory nor delusional during the evaluation. Tr. 641. However, Sullivan did report auditory hallucinations. Tr. 641.

Halas's assessment included diagnoses of generalized anxiety disorder with significant features of obsessive compulsive disorder; major depression, recurrent type with psychotic

features; and mixed personality disorder, including paranoid, borderline, dependent.  Tr.  642.  Halas assessed a GAF score of 45.[5]  Tr. 642.

When assessing Sullivan's functional abilities, Halas opined: (1) Sullivan appeared to have no deficits in understanding, remembering, and carrying out instructions; (2) Sullivan appeared to have no deficits in maintaining attention and concentration and maintaining persistence and pace to perform simple tasks and to perform multi-step tasks; (3) Sullivan seemed to have severe problems in responding appropriately to supervision and co-workers in a work setting, noting, "Symptoms of depression, anxiety, Obsessive Compulsive Disorder will affect his ability to be affective in his ability to work with others and this includes family members, peers, supervisors, etc.;" and (4) Sullivan seemed to have severe problems in responding appropriately to work pressures in a work setting noting, "Symptoms of anxiety are likely to increase dramatically under the pressures of a normal work setting."  Tr. 642-643.

*State agency reviewing psychologists*

On September 21, 2011, state agency reviewing psychologist Mel Zwissler, Ph.D., ("Zwissler"), completed a Psychiatric Review Technique (Tr. 327-328) and Mental RFC Assessment (Tr. 331-333).

In the Psychiatric Review Technique, Zwissler opined that Sullivan had mild restrictions in activities of daily living and moderate difficulties in social functioning and concentration, persistence or pace.  Tr. 328.  Sullivan had no episodes of decompensation.  Tr. 328.

In the Mental RFC Assessment, Zwissler rated Sullivan's mental functional abilities in 20 areas within the four main categories of: understanding and memory; sustained concentration and

---

[5]  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  DSM-IV-TR, at 34.

persistence; social interaction; and adaption. Tr. 631-333. Zwissler found Sullivan moderately limited in his ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; complete a normal workday or workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. Tr. 331-333. In the other areas, Zwissler found Sullivan not significantly limited or that there was no evidence of limitation. Tr. 331-333. Zwissler further explained his Mental RFC Assessment stating, Sullivan "retains the ability to perform work activity that includes a wide range of simple, repetitive tasks involving superficial contact with others in a setting free of strict production standards, frequent changes or fast pace. Needs some help planning beyond the immediate day." Tr. 333.

On reconsideration, on December 23, 2011, state agency reviewing psychologist Karen Steiger, Ph.D., ("Steiger"), also completed a Psychiatric Review Technique (Tr. 357-359) and a Mental RFC Assessment (Tr. 362-364) wherein she reached the same conclusions as Zwissler, including the opinion that Sullivan "retains the ability to perform work activity that includes a wide range of simple, repetitive tasks involving superficial contact with others in a setting free of strict production standards, frequent changes or fast pace. Needs some help planning beyond the immediate day." 364.

C.  **Testimonial evidence**

### 1. Sullivan's testimony

Sullivan was represented at and testified at the hearing.  Tr. 261-310.  He testified that a typical day includes waking up with a stiff neck and back around 7:30 or 8:00 a.m.  Tr. 262.  He makes coffee and checks e-mail on the computer.  Tr. 262.  Then, he usually heads out to check on the garden, which is about 75 feet from the house.  Tr. 262-263.  Sullivan and his wife plant a garden yearly.  Tr. 270.  Sullivan rototills the garden to get the soil ready for planting but his wife does most of the work planting.  Tr. 270-271.  After checking on the garden, he works on the computer again.  Tr. 264.  He has been trying to write an inspirational/spiritual book for the past couple years and tries to write a page each day.  Tr. 264.  He watches television and sometimes goes out into the garage.  Tr. 265.  He might change the oil in the lawnmower or mow the grass.  Tr. 269.  When mowing the grass, he uses a riding lawnmower.  Tr. 269.  Although he is not normally a person who takes a nap, he has been sleeping during the day.  Tr. 264-265.  Over the prior two years, Sullivan noticed himself getting tired during the day.  Tr. 265.  He also indicated that he had been sleeping or resting more since being prescribed Abilify and Celexa.  Tr. 287-288.  He had been prescribed those medications about a month before the hearing.  Tr. 287-288.

Sullivan tries to avoid people, including his neighbors.  Tr. 265-266.  If his neighbors are outside, he will watch out the window and wait until they are gone before heading outside.  Tr. 266.  While working at Digital Dish, Sullivan's wife accompanied him and handled the paperwork with the customers while he completed the install.  Tr. 266-267.  While working as a volunteer firefighter, Sullivan stated that he tried to perform jobs that limited his interaction with others.  Tr. 293-295.  Sullivan stopped attending church in 2004.  Tr. 272.  He stated, "I feel that God is calling me out of Christianity."  Tr. 272.

Sullivan's wife or mom usually does the shopping.  Tr. 273.  Sullivan can drive.  Tr. 273. He was in an accident with his mom's car the prior year and the car was declared a total loss by the insurance company.  Tr. 273.  Thus, they no longer have a car but are able to borrow his mom's friend's car when needed.  Tr. 273.

With respect to his mental impairments, Sullivan stated that he always knew he had some issues but it was not until Social Security sent him to the consultative doctor and he was told he had OCD that he realized he needed to seek mental health treatment.  Tr. 297-298.  One month prior to the hearing, in June 2012, Sullivan saw Nurse Christy at Pathways for an initial evaluation.  Tr. 297-298.  Before that, he had not been able to find a provider that was willing to see him without medical insurance coverage.  Tr. 298.  He indicated that he was scheduled for additional appointments at Pathways.  Tr. 298.  Sullivan explained that he has certain rituals that he must perform.  Tr. 300-301.  For example, he has to take a shower every evening at 7:00 p.m., he has to take his coffee a certain way, and, before going to bed each night, his clothes have to be set out in a specific manner.  Tr. 259, 300-301.

Sullivan does not like people visiting or touching or moving his things around.  Tr. 302. When his children visit, they have a tendency to move his things and it sends him through the roof with his temper.  Tr. 302-303.  Sullivan has intrusive or obsessive thoughts in his head.  Tr. 302.  For example, he will have conversations in his head, thinking he is talking with someone, and he becomes upset about something he thinks the other person said.  Tr. 302.  On one occasion, Sullivan became so upset with a conversation that he thought he was having that it prompted him to email the individual that he thought he had been speaking to.  Tr. 302.  The individual Sullivan emailed was confused because he was not part of the conversation. Tr.  302.

Sullivan proceeded to apologize by sending letters on multiple occasions and eventually the individual wanted nothing to do with him. Tr. 303.

### 2. Vocational Expert's testimony

Vocational Expert ("VE") Nancy J. Borgeson testified at the hearing. Tr. 310-320, 445. The VE described Sullivan's past work. Tr. 311-312. The ALJ then posed hypothetical questions to the VE. Tr. 312.

First, the ALJ asked the VE to assume an individual of the same age as and with the same education and work experience as Sullivan who was limited to light work, sitting, standing and walking 6 hours in an 8-hour day; no ropes, ladders or scaffolds; no unprotected heights; occasional posturals like stooping, balancing, kneeling, crouching, and crawling; occasional interaction with co-workers, supervisors, and the general public; and low stress jobs, meaning no production quotas or tasks. Tr. 313. The VE indicated that the hypothetical involved light unskilled work and that there would be light, unskilled jobs that such a person could perform, including (1) electronics worker; (2) cleaner (housekeeping); and (3) mail clerk (not in post office).[6] Tr. 313-314.

The ALJ then altered the hypothetical to add a sit/stand option at will. Tr. 314. The VE indicated that, although there are not a lot of light jobs that allow for a sit/stand at will option, with such a limitation, the described individual would remain able to perform the mail clerk job. Tr. 314.

Next, the ALJ asked the VE to consider the first hypothetical (without the sit/stand option at will) but to consider a sedentary rather than light RFC. Tr. 314-315. The VE indicated that, with that change, the described individual could perform the job of table worker, an unskilled,

---

[6] The VE provided regional, state and national job numbers for each of the listed jobs. Tr. 313-314.

9

sedentary job.[7] Tr. 315. The VE indicated that she was unable to provide any additional sedentary, unskilled jobs because other jobs would involve more than occasional contact with the public or would be production jobs. Tr. 315.

The ALJ also asked some questions regarding near acuity and the VE responded that a limitation of frequent near acuity would not change the jobs identified. Tr. 317-318.

In response to questioning by Sullivan's counsel, the VE indicated that, if an individual was off task 20% or more of the workday and would likely miss 4 or more days of work per month, the individual would not be able to sustain full-time work. Tr. 319-320.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[8] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

---

[7] The VE provided regional, state and national job numbers for the table worker job. Tr. 315.

[8] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

10

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[9] the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[10] *see also* *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her August 22, 2012, decision, the ALJ made the following findings:[11]

---

[9] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

[10] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[11] The ALJ's findings are summarized.

1. Sullivan met the insured status requirements through December 31, 2009. Tr. 241.

2. Sullivan had not engaged in substantial gainful activity since September 30, 2007, the alleged onset date. Tr. 241.

3. Sullivan had the following severe impairments: arthritis of the back, mood disorder, generalized anxiety disorder with obsessive-compulsive features and a personality disorder with paranoid, dependent borderline features. Tr. 241-242. Sullivan's eye condition was not a severe impairment. Tr. 242.

4. Sullivan did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 242-243.

5. Sullivan had the RFC to perform light work except he was limited to sitting, standing and/or walking up to 6 hours in an 8-hour workday; lifting and carrying 10 pounds frequently and 20 pounds occasionally; restricted to occasional stooping, bending, crawling, balancing, kneeling but no crawling,[12] or unprotected heights like ropes, ladders, or scaffolds; occasional interaction with co-workers, supervisors and the general public; low stress work that does not require quotas or high production; and a restriction to frequent near acuity. Tr. 243-248.

6. Sullivan was unable to perform any past relevant work. Tr. 248.

7. Sullivan was born in 1967 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 248.

8. Sullivan had a limited education and was able to communicate in English. Tr. 248.

9. Transferability of job skills was not material to the determination of disability. Tr. 248.

10. Considering Sullivan's age, education, work experience and RFC, there were other jobs that existed in significant numbers in the national economy that Sullivan could perform, including electronics worker, cleaner, mail clerk, and table worker. Tr. 248-249.

---

[12] In the RFC, the ALJ stated that Sullivan could occasionally crawl but then indicated that Sullivan could not crawl. Tr. 243. Sullivan does not challenge what appears to be an inconsistency with respect to his ability to crawl.

Based on the foregoing, the ALJ determined that Sullivan had not been under a disability from September 30, 2007, through the date of the decision.  Tr. 249.

## V. Parties' Arguments

Sullivan argues that the RFC is not supported by substantial  evidence because the ALJ did not properly account for mental limitations contained in the opinions of the consultative examining psychologist and the state agency reviewing psychologist.  Doc. 17, pp. 9-11.

In response, the Commissioner argues that the ALJ fully considered and addressed the evidence and opinions in determining the mental RFC limitations.  Doc. 18, pp. 6-9.  The Commissioner also suggests that Sullivan is asking the Court to impermissibly reweigh the evidence.  Doc. 18, pp. 8-9.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

Sullivan argues that the RFC is not supported by substantial evidence because the ALJ gave "significant weight" to the opinion of consultative examining psychologist Halas but the ALJ did not include in the RFC limitations consistent with Halas's findings of severe problems in relating to others and in responding appropriately to work pressures in a work setting. Doc. 17, pp. 9-10. Sullivan also argues that the ALJ gave "some weight" to the opinion of the state agency reviewing psychologist, which included the opinion that Sullivan would need a setting free of strict production standards, frequent changes or fast pace and Sullivan would need help planning beyond the immediate day, but the ALJ only included in the RFC a limitation relating to quotas or high production. Doc. 17, pp. 10-11.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. § 404.1545(a); 20 C.F.R. § 404.1546(c); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ – not a physician – ultimately determines a Plaintiff's RFC."). However, Social Security Ruling 96–8p states: "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Social Security Ruling 96–8p, *Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184, at *7 (July 2, 1996) ("SSR 96-8p).

In assigning weight to the opinion evidence the ALJ stated,

14

> As for the opinion evidence, the undersigned assigned significant weight to the opinion of the consultative psychological examiner, Mr. Halas.  Mr. Halas conducted a full evaluation, including a mental status evaluation and a personal history of the claimant (Ex. 4F).  A State agency psychological consultant, Karen Steiger, Ph.D., also reviewed the record and agreed almost in whole with Mr. Halas' findings with the exception of finding moderate limitations in concentration, persistence or pace (Exs. 5A, 6A).  The opinion evidence, with exception of an other source, is consistent with the residual functional capacity finding.  The undersigned afforded less weight to that other source's (Ms. Christy's) opinion because of the apparent stark discrepancy with the opinions of acceptable medical sources, the timing of the opinion (a month before the claimant's hearing), and absence of a treating history with this other source.  Further, the claimant's testimony that he is unable to afford treatment is unpersuasive in the absence of any showing that he has sought treatment with a public or indigent health program.

Tr. 247.  With respect to the opinion evidence, the ALJ also stated,

> Although the claimant has not participated in any mental health treatment program, the undersigned included limitations in the residual functional capacity assessment that are consistent with the findings of most of the acceptable medical and other source opinions of record.  The other source opinion by Ms. Christy provided about a month from the hearing was evaluated but given limited weight because of the absence of treatment history and the vast contrast of that opinion with the whole of the evidence, including the opinions of acceptable medical sources, the claimant's daily activities of maintaining a face book page and writing a book, and the lack of showing that he has attempted to participate in a public or indigent health program.
>
> * * *
>
> Because of the absence of psychological treatment, the Social Security Administration provided a consultative psychological evaluation to determine if a psychological impairment(s) and limitation(s) existed (Ex. 4F).  The undersigned adopted most of the consultative findings, but also gave some weight to the reviewing psychologist, Dr. Steiger, in finding moderate limitations in concentration, persistence or pace.
>
> The other source opinion by Ms. Christy that the claimant had marked to extreme limitations in the following domains: understanding and memory; sustained concentration and persistence; social interaction; and adaptation was not persuasive as it did not cite to any specific evidence supporting those findings, including a psychological history.  Ms. Christy's also [sic] opinion appeared excessive in relation to opinions from acceptable medical sources and the claimant's daily activities, including gardening, mowing the lawn, maintaining a face book page and undertaking the writing of a book.  There is also very limited

15

> reference to psychological signs, symptoms, or limitations in other medical records outside those created for purpose of psychological assessment. The level of limitation described by Ms. Christy suggests a level of functioning that would require intensive psychological treatment, which the claimant has not participated in nor has Ms. Christy or any other psychological consultant recommended.

Tr. 247-248.

### *Halas's opinion*

Halas opined that Sullivan seemed to have *severe problems* in responding appropriately to supervision and co-workers in a work setting noting, "Symptoms of depression, anxiety, Obsessive Compulsive Disorder will affect his ability to be affective in his ability to work with others and this includes family members, peers, supervisors, etc." Tr. 643 (emphasis supplied). Halas also opined that Sullivan seemed to have *severe problems* in responding appropriately to work pressures in a work setting noting, "Symptoms of anxiety are likely to *increase dramatically* under the pressures of a normal work setting." Tr. 643 (emphasis supplied).

The ALJ provided "significant weight" to Halas's opinion. Tr. 247. However, mental limitations included in the RFC, i.e., "occasional interaction with co-workers, supervisors and the general public; low stress work that does not require quotas or high production," (Tr. 243) are inconsistent with Halas's finding of severe problems in Sullivan's ability to respond appropriately to supervision and co-workers and work pressures in a work setting and the ALJ did not explain the reasons for the inconsistency. Rather, the ALJ incorrectly stated, "The opinion evidence, with exception of an other source, is consistent with the residual functional capacity finding." Tr. 247. The ALJ also stated conclusorily that, "[a]lthough the claimant has not participated in any mental health treatment program, the undersigned included limitations in the residual functional capacity assessment that are consistent with the findings of most of the acceptable medical and other source opinions of record." Tr. 247. However, conclusory

16

statements of this nature are insufficient to allow this Court to conduct a meaningful review of the decision to determine whether it is supported by substantial evidence.

The Court's inability to conduct a meaningful review is further hampered by the fact that the ALJ provided differing characterizations of Halas's opinion.  In one instance, the ALJ indicated that "Mr. Halas found no cognitive deficits or limitations in concentration, persistence or pace.  He found, however, *significant problems* in responding appropriately to supervision and co-workers and work pressures in a work setting."  Tr. 245 (emphasis supplied).  Later, when discussing Halas's opinion, the ALJ stated that "Mr. Halas opined that the claimant would have *some difficulty* with responding appropriately to co-workers, supervisors and work pressures."  Tr. 246 (emphasis supplied).   In fact, Halas indicated that Sullivan seemed to have severe problems in the area of responding appropriately to supervision and to co-workers in a work setting.  Tr. 643.  Thus, the ALJ should have more clearly explained her conclusion that Halas opined Sullivan would have only "*some difficulty* with responding appropriately to co-workers, supervisors and work pressures."  Tr. 246 (emphasis supplied).  Further, Halas indicated that Sullivan's anxiety symptoms were likely to *increase dramatically* under the pressures of a normal work setting.  Tr. 634 (emphasis supplied).  Without further explanation, the Court is unable to deduce the ALJ's reasoning that led her to conclude that Halas had opined that Sullivan had only "*some difficulty* with responding appropriately to . . . work pressures."  Tr. 246 (emphasis supplied).

In light of the "significant weight" provided to Halas's opinion, which appears to contain greater limitations than those found by the ALJ, the ALJ should have more clearly explained how the mental RFC finding was consistent with Halas's opinion or, in accordance with SSR 96-8p, the ALJ should have explained why she did not adopt Halas's more severe limitations.  *See*

17

*e.g., Moretti v. Colvin*, 2014 WL 37750, * 10 (N.D. Ohio Jan. 6, 2014) (reversing where an ALJ's RFC conflicted with a medical source opinion in the record and the ALJ had not explained why the opinion was not adopted); *see also Thompson v. Soc. Sec. Admin.*, 2014 WL 356974, * 4 (N.D. Ohio Jan. 31, 2014) (same).

<u>Steiger's opinion</u>

In finding moderate limitations in concentration, persistence or pace, the ALJ gave "some weight" to Steiger's opinion. Tr. 247. Steiger opined that Sullivan "retains the ability to perform work activity that includes a wide range of simple, repetitive tasks involving superficial contact with others in a setting free of strict production standards, frequent changes or fast pace. Needs some help planning beyond the immediate day." Tr. 364. Thus, Steiger's opinion included more than production limitations; her opinion also included limitations of no frequent changes or fast pace. Tr. 364. Accordingly, in order to permit meaningful judicial review, the ALJ should have explained how her RFC finding of low stress work accounted for these limitations and/or why she did not adopt all the limitations pertaining to concentration, persistence or pace found by Steiger. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 517 (6th Cir. 2010) (citing *Whack v. Astrue*, 2008 WL 509210 at *8 (E.D. Pa. Feb. 26, 2008) for its citations to "cases for the proposition that hypothetical restrictions of 'simple' or 'low-stress' work do not sufficiently incorporate the claimant's medically established limitations where claimant has moderate deficiencies in concentration, persistence or pace.[13]

Since the RFC finding appears to conflict with medical opinions that the ALJ gave "significant" and "some" weight to, the ALJ's lack of clear articulation regarding why she did

---

[13] Steiger also opined that Sullivan should be limited to superficial contact with others. Tr. 364. This limitation was more restrictive than the "occasional interaction" limitation the ALJ included in the RFC. Thus, not only is further explanation needed with respect to the ALJ's RFC finding relative to concentration, persistence or pace, further explanation is also required with respect to the social limitation contained in the RFC since it is also inconsistent with Steiger's opinion.

not include additional or more restrictive limitations consistent with those opinions in the RFC leaves the Court unable to conduct a meaningful review to determine whether the decision is supported by substantial evidence. Further, the Court is unable to state with certainty that the outcome of the disability determination would not have been different had additional concentration, persistence or pace restrictions or more restrictive social interaction restrictions been included in the RFC. Accordingly, reversal and remand is warranted for further proceedings consistent with this Opinion.

### VII. Conclusion

For the reasons set forth herein, the Court **REVERSES and REMANDS** the Commissioner's decision.[14]

February 17, 2015

Kathleen B. Burke
United States Magistrate Judge

---

[14] This Opinion should not be construed as requiring a determination on remand that Sullivan is in fact disabled.